Filed 7/15/14  In re E.M. CA5

## NOT TO BE PUBLISHED IN OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## FIFTH APPELLATE DISTRICT

| | |
|---|---|
| In re E.M. et al., Persons Coming Under the Juvenile Court Law. | |
| FRESNO COUNTY DEPARTMENT OF SOCIAL SERVICES,<br><br>Plaintiff and Respondent,<br><br>v.<br><br>S.P.,<br><br>Defendant and Appellant. | F068575<br><br>(Super. Ct. No. 13CEJ300051)<br><br><br>**O P I N I O N** |

### THE COURT*

APPEAL from orders of the Superior Court of Fresno County.  Houry A. Sanderson, Judge.

Conness A. Thompson, under appointment by the Court of Appeal, for Defendant and Appellant.

Daniel Cederborg, County Counsel, Amy K. Cobb, Deputy County Counsel, and Janelle Kelley, Assistant County Counsel, for Plaintiff and Respondent.

-ooOoo-

---

*       Before Cornell, Acting P.J., Gomes, J., and Detjen, J.

Appellant S.P. (mother) appeals from the juvenile court's dispositional order denying her reunification services as to her six-year-old son, E.M., Jr. and three-year-old daughter, E.S.M., under Welfare and Institutions Code section 361.5, subdivision (b)(4) (death of a child)[1] because mother caused the death of their six-year-old sister J.M. Mother contends the juvenile court abused its discretion in determining it was not in the children's best interest to offer her reunification services. We affirm.

## PROCEDURAL AND FACTUAL SUMMARY

Mother has four children, two teenage daughters, D.E. and R.E., and two small children, E.M., Jr. (E.M.) and E.S.M., the subjects of this appeal. Mother had a fifth child, a daughter, J.M., who died in February 2013 at the age of six. Mother's boyfriend, E.M., Sr. (father), is the father of J.M., E.M. and E.S.M. Mother and father have a long history of domestic violence. However, prior to these dependency proceedings, the family had no child welfare history.

On the morning of Monday, February 4, 2013, J.M. was found unresponsive in bed. The Friday before, J.M. was sent home early from school with the flu. Over the weekend mother gave J.M. adult-strength NyQuil and ibuprofen every six hours. Mother said she gave J.M. the "prescribed" dosage of the ibuprofen. She did not remember what dosage of NyQuil she administered. The record reflects J.M. had cold- and flu-like symptoms, but does not provide any information as to J.M.'s physical response to the medication. Mother did not take J.M.'s temperature or consult a doctor. Mother gave J.M. the last dosage of NyQuil around 8 p.m. on Sunday night just before putting her to bed. A paramedic pronounced J.M. dead at the home and transported her to the coroner's office.

---

[1]    All further references are to the Welfare and Institutions Code unless otherwise indicated.

2

The coroner ruled that J.M. died of an acute alcohol overdose. Toxicology tests on the autopsy blood revealed "an elevated fatal ethyl alcohol level" as well as the presence of doxylamine, a constituent of NyQuil. J.M. also had a blood alcohol level of 0.45%. In addition, J.M. also tested positive for influenza A on a viral nasal swab culture and microscopic sections of her larynx showed moderate chronic inflammation consistent with viral laryngitis. The coroner reported the manner of J.M.'s death as "pending." There are no follow-up reports explaining the manner of her death.

The Fresno Police Department investigated J.M.'s death and submitted the case to the district attorney's office for review. No criminal charges were filed against mother.

On February 22, 2013, police officers responded to a report of domestic violence and a stabbing at mother's home. Mother and father were intoxicated and arguing over who was responsible for J.M.'s death. During the argument, mother stabbed father in the stomach with a paring knife and he hit her in the mouth knocking out two of her front teeth. Then four-year-old E.M. and two-year-old E.S.M. were in the middle of the fight trying to break it up. Mother and father were arrested for willful infliction of corporal injury and mother was also charged with assault with a deadly weapon. They were transported to the hospital for treatment. The children were taken into protective custody by the Fresno County Department of Social Services (department) and placed in foster care.

Father told the investigating social worker he was an alcoholic and he and mother were drinking the day of their arrest to cope with J.M.'s death. He said he was not in the home on the day of J.M.'s death or the three days prior. He said he and mother were not married but had been in a relationship for eight years. He loved her and intended to continue the relationship. He also said he had been arrested in the past for domestic violence and had served a prison sentence for it. He was last arrested for domestic violence in 2006 but he and mother regularly fought. The children witnessed these fights

3

which involved yelling, cussing and slamming doors. Father recognized his need for counseling and treatment.

Mother told the social worker she did not drink alcohol regularly and did not use drugs. She did not believe she needed substance abuse treatment or domestic violence counseling either as a perpetrator or victim. She did, however, believe she needed grief counseling.

The department filed an original dependency petition alleging in part mother and father's domestic violence placed the children at a substantial risk of serious physical and emotional harm (§ 300, subds. (b) & (c)). The petition also alleged mother negligently caused J.M.'s death by giving her adult-strength NyQuil and ibuprofen; thus, placing E.M. and E.S.M. at a substantial risk of abuse or neglect. (§ 300, subd. (f).)

Several days after the department placed the children in foster care, the foster mother reported that E.M. stated he wanted to kill the foster parent's baby. He was having nightmares from which he awoke screaming, crying and shaking. He was also physically aggressive with E.S.M. and hit and tried to hurt her. Approximately a week later he tried to stab the foster parent's dog with a knife and had to be removed from that placement.

On February 28, 2013, at the detention hearing, the juvenile court sustained the original dependency petition and ordered the department to provide mother and father parenting classes, substance abuse, mental health and domestic violence evaluations, random drug testing and weekly supervised visitation. The juvenile court also ordered the department to provide the children mental health evaluations and refer mother, father and the children for any recommended treatment.

In March 2013, mother enrolled in a parenting class, signed up for random drug testing and completed the evaluations. She disclosed during her substance abuse evaluation that she struggled with alcohol use and had consumed alcohol to intoxication

4

for 18 years.  As a result, she was referred for intensive outpatient substance abuse treatment.

As part of her domestic violence evaluation, mother completed the domestic violence inventory (DVI).  On the control scale of the DVI, mother scored 69%, placing her in the medium risk range.  According to the DVI profile, a medium risk scorer's "emotions can interfere with their judgment─resulting in unpredictable behavior.  When asked about control issues, [mother] replied, 'I have no problem controlling my anger.'"  On the violence scale of the DVI, mother scored 94%, placing her in the maximum risk range.  According to the DVI profile, such a person "should be considered dangerous."  As a result of her scores on the DVI, it was recommended mother complete a 52-week batterer's treatment program.

During her mental health evaluation, mother described herself as "severely depressed, overwhelmed, stressed out.  Grieving!"  She reported being abused and neglected as a child and being exposed to her parents' extreme domestic violence.  However, according to the therapist, "[mother] showed little insight and poor judgment with her own children."  The therapist recommended the department refer mother for a psychological evaluation.  The department did not follow the therapist's recommendation.

By November 2013, mother successfully completed a parenting program and an alcohol and drug recovery treatment program at Delta Care, Inc.  She elected to continue in Delta Care's relapse prevention program twice a week.  Mother registered for a 52-week batterer's treatment program in July 2013 and only attended two sessions.  Consequently, she was terminated from the program.  In the termination report dated August 2013, the clinical director of the program indicated mother had not made any progress in empathy and insight.  However, she attended the domestic violence intervention education sessions at Delta Care and actively participated in the support

5

meetings. Mother also participated in mental health therapy and random urinalysis screening, testing negative for all illicit drugs and alcohol.

Father also completed a substance abuse program and was doing very well. He and mother were no longer in a relationship but were committed to reunifying with their children. They regularly visited the children under the department's supervision and the children were happy to see them.

Despite mother and father's demonstrated commitment to the children and participation in services, the department recommended the juvenile court deny mother reunification services under section 361.5, subdivision (b)(4)[2] for having caused J.M.'s death and father under section 361.5, subdivision (b)(13) for failure to treat his substance abuse problem. The department informed the court that the children's foster parent was not willing to provide them a permanent placement but their maternal great-aunt was willing and was being evaluated.

In November 2013, the juvenile court convened a combined hearing on jurisdiction and disposition. A few days before the hearing, the department filed a first amended petition striking one of the section 300, subdivision (b) allegations and amending the subdivision (f) allegation to correct the date of J.M.'s death and delete an incorrect date associated with the toxicology results. Mother and father submitted to the allegations in the first amended petition and the juvenile court found E.M. and E.S.M. to be minors described in section 300, subdivisions (b), (c) and (f). The court proceeded with the dispositional phase of the hearing and heard testimony.

---

**2** Section 361.5, subdivision (b)(4) provides as relevant here: "Reunification services need not be provided to a parent … described in this subdivision when the court finds, by clear and convincing evidence, ….  [¶ ] … [¶ ] (4) [t]hat the parent … of the child has caused the death of another child through abuse or neglect."

Social worker Rene Mendoza testified that mother took a strong interest in the children's needs and that, though Mendoza had not observed mother with the children, mother had reportedly made "a dramatic improvement" in setting boundaries for the children during visitation. Mendoza testified that the children witnessed ongoing domestic violence and that E.M. was the one who found J.M. unresponsive. E.M. still had nightmares, threw severe tantrums and displayed aggressive behavior toward E.S.M. but not as often.

Mendoza further testified that the children were working with a therapist to transition them into the home of their maternal great-aunt with whom E.M. reportedly had a "very strong bond."

At the conclusion of Mendoza's testimony the juvenile court indicated the evidence did not support a denial of reunification services to father and asked county counsel to consult with the department. Mother's attorney asked the court to accept a written declaration by mother's 18-year-old daughter D.E. as an offer of proof. In her declaration, D.E. praised her mother's parenting of her and her siblings and attributed her own scholastic success to mother. She graduated from high school with a grade point average of 3.6, was the valedictorian of her class and was a first-year student at the University of California at Berkeley. The court accepted the offer of proof and continued the hearing until the following morning.

The following morning, county counsel withdrew its recommendation to deny father reunification services and testimony resumed. Mother's attorney called Anna Dominguez, the visitation facilitator, who supervised visits between mother and the children since April 2013. The children were always happy to see mother and were very affectionate toward her. Dominguez never witnessed mother act aggressively toward the children or place them at risk. Mother came very well prepared for the visits and interacted appropriately with the children. When the visits ended, she hugged and kissed

7

the children and told them she loved them. Sometimes E.M. cried at the end of the visit and E.S.M. clung to mother not wanting her to leave. However, the children had a good relationship with their care provider and if the children were not upset, mother simply left the visitation room. Dominguez believed mother was ready to advance to unsupervised visits, but was not qualified to offer an opinion about parental risk or the parent/child bond.

At the conclusion of the hearing, the juvenile court denied mother reunification services under section 361.5, subdivision (b)(4), having found she caused J.M.'s death and it was not in the children's best interest to reunify. The court ordered reunification services for father and ordered mother's visitation order to remain unchanged. This appeal ensued.

## DISCUSSION

Mother contends the juvenile court erred in denying her reunification services not because it applied section 361.5, subdivision (b)(4) to her case, but because it did not find reunification would serve the best interest of the children under section 361.5, subdivision (c).

We review the denial of reunification services under section 361.5, subdivision (c) for an abuse of discretion. "As a reviewing court, we will reverse a juvenile court's order denying services only if that discretion has been clearly abused." (*In re Angelique C.* (2003) 113 Cal.App.4th 509, 523-524.) We find no abuse of discretion.

As a general rule, the juvenile court must provide reunification services when it removes a child from parental custody. The court "need not," however, provide reunification services when it finds by clear and convincing evidence the existence of one or more specified circumstances enumerated in section 361.5, subdivision (b)(1)-(16). One of the circumstances that will permit denial of reunification services is found in

8

section 361.5, subdivision (b)(4):  "the parent … has caused the death of another child through abuse or neglect."

When, as here, the juvenile court finds that a parent is described under section 361.5, subdivision (b)(4), it is prohibited from ordering reunification services for that parent unless it finds by clear and convincing evidence that reunification is in the best interest of the dependent child.  (§ 361.5, subd. (c).)

In *In re Ethan N.* (2004) 122 Cal.App.4th 55 (*Ethan N.*) this court examined the concept of best interest in the context of the death of a child.  (*Ethan N.*, *supra*, at pp. 66-67.)  The juvenile court in that case granted reunification services to a mother whose negligence contributed to the murder of her one-month-old son by her husband.  (*Id.* at pp. 59-60.)  We concluded the juvenile court abused its discretion in ordering services and reversed.  In so doing, we acknowledged the Legislature permitted the possibility that a parent guilty of causing the death of a child through abuse or neglect could be accorded reunification services.  However, we concluded such a case is rare.  (*Id.* at pp. 68-69.)  We stated:

> "The cases in which a parent who has been responsible for the death of a child through abuse or neglect will be able to show that reunification will serve the best interest of another child or other children will be rare.  'The enormity of a death arising out of … child abuse swallows up almost all, if not all, competing concerns.…'  [Citation.]" (*Ethan N.*, *supra*, 122 Cal.App.4th at pp. 68-69.)

Nevertheless, we formulated and applied four factors we concluded juvenile courts should consider in determining whether reunification would serve a child's best interest.  These are:  (1) the "parent's current efforts and fitness as well as the parent's history," (2) the gravity of the problem that led to the dependency, (3) the strength of the relative bonds between the child and the parent and the child and his or her caretakers, and (4) the child's need for stability and continuity.  (*Ethan N.*, *supra*, 122 Cal.App.4th at pp. 66-67.)

9

Mother argues the *Ethan N.* factors applied to her case compel a finding in her favor. Specifically, mother points out that she has no prior child welfare history and successfully raised her daughters, D.E. and R.E. Further, she claims J.M.'s death is distinguishable from other cases involving the death of a child in that J.M. died as the result of an isolated tragic accident rather than from ongoing physical abuse.[3] Finally, mother asserts she regularly participated in her pre-dispositional services, the children are closely bonded to her, and the children would have the stability and continuity they need if placed with her under family maintenance services.

Indeed, as mother points out, there *is* evidence which favors reunification. However, best interest in cases involving the death of a child is not reflected by a preponderance of favorable evidence. Rather, the death will always be the focal point and the question will always be whether other considerations are so compelling as to virtually necessitate reunification despite the death.

Mother contends her case is unique because J.M. died as the result of "a one-time tragic mistake in administering an over-the-counter medication." She further contends *In re Ethan C.* (2012) 54 Cal.4th 610 (*Ethan C.*) provides precedent for ordering reunification services in such a case.

---

**3**      Mother cites *Ethan N.*, *supra*, 122 Cal.App.4th 55, *In re Alexis M.* (1997) 54 Cal.App.4th 848 (*Alexis M.*) and *Patricia O. v. Superior Court* (1999) 69 Cal.App.4th 933 (*Patricia O.*). In *Ethan N.*, the mother's neglect allowed her husband to murder her 39-day-old son through repeated and extensive physical abuse culminating in cerebral hypoxia caused by a golf ball-sized wad of paper lodged deep in the baby's esophagus. (*Ethan N.*, *supra*, at p. 61.) In *Alexis M.*, a father was convicted of felony child abuse in the death of his four-month-old son resulting from "very serious acts of abuse … too shocking to ignore …." (*Alexis M.*, *supra*, at pp. 850-851.) In *Patricia O.*, the mother's former boyfriend subjected her baby to multiple acute and chronic injuries. The baby died of "multiple injuries to the abdomen area as the result of blunt force trauma." (*Patricia O.*, *supra*, at pp. 935-936.)

10

In *Ethan C*., the father was driving his infant daughter to the hospital for treatment of her injured arm when, through no fault of the father, another vehicle collided with his car. The daughter was not secured in a child safety seat but was sitting on an adult relative's lap. The child died as the result of blunt force injuries. Child protective services took father's two sons, a three year old and a seven month old, into protective custody and the juvenile court assumed jurisdiction over them under section 300, subdivision (f) (death of a child by parental abuse or neglect) and ordered family reunification services for the father. (*Ethan C*., *supra*, 54 Cal.4th at pp. 618-621.)

The father in *Ethan C*. appealed arguing that dependency jurisdiction based on section 300, subdivision (f) requires evidence of criminal negligence, not an ordinary breach of care such as "his single failure" to secure his daughter properly in his vehicle. The court of appeal and the California Supreme Court held that ordinary negligence is sufficient to sustain a section 300, subdivision (f) allegation and affirmed. (*Ethan C*., *supra*, 54 Cal.4th at pp. 622-623, 642.)

We find *Ethan C*. of no precedential value in mother's case. *Ethan C*. examined the requisite parental culpability to support a jurisdictional finding under section 300, subdivision (f). *Ethan C*. did *not* examine the juvenile court's decision to order the father reunification services and its underlying determination that it was in his sons' best interest to do so despite the death of their sister. Therefore, *Ethan C*. is not, as mother contends, "instructive" simply because the juvenile court in that case ordered reunification services.

Further, we reject mother's contention J.M.'s death was caused by a "one-time mistake." She gave J.M. an unspecified dosage of adult-strength NyQuil purportedly every six hours over approximately two and a half days. Unfortunately, there is no evidence on the record as to the manner of J.M.'s death or a description of the physical effects the NyQuil had on her over that period of time. However, one can reasonably

11

infer that she manifested outward signs that should have alarmed mother and caused her to discontinue the NyQuil given the fact that J.M.'s blood alcohol was rising to a toxic level. We believe the juvenile court aptly described it as "administering poison" "over a period of time." As such, it was not as mother contends a "one-time" discrete accident.

Finally, we believe the impact of mother's domestic violence and its attendant emotional abuse on the children factors significantly in this case. E.M., in particular, was suffering its effects. He awoke in the night screaming, crying and shaking. More disturbingly, he had already internalized the violence he witnessed. He wanted to kill the foster mother's baby and tried to stab the foster parent's dog. We do not believe it was coincidental that E.M. chose to use a knife. We also note that of all the services offered to mother, the batterer's treatment program was the one she needed most and the one in which she chose not to participate.

We conclude the circumstances of J.M.'s death, mother's untreated domestic violence and the emotional abuse already inflicted on the children support the juvenile court's finding reunification services for mother would not serve the children's best interests. Thus, we further conclude the juvenile court did not abuse its discretion in denying mother reunification services under section 361.5, subdivision (c).

## DISPOSITION

The judgment is affirmed.

12